*To Be Argued By Michael H. Sussman*

# 14-1798-cv

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

------------------------------------------------------

JESYCA GREENE,

*Plaintiff-Appellant,*

v.

ENLARGED CITY SCHOOL DISTRICT OF MIDDLETOWN, NEW YORK,

*Defendant-Appellee.*

------------------------------------------------------

**On Appeal from an Order and Judgment of the
United States District Court for the Southern District of New York**

---

**APPELLANT'S BRIEF-IN-CHIEF & SPECIAL APPENDIX**

---

Michael H. Sussman
SUSSMAN & WATKINS
*Attorneys for Plaintiff-Appellant*
P.O. Box 1005, 1 Railroad Ave, Ste. 3
Goshen, New York 10924
(845) 294-3991 [Tel.]
(845) 294-1623 [Fax]

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………....     iii

PRELIMINARY STATEMENT…………………………………….....     1

STATEMENT OF JURISDICTION…………………………….........     2

STATEMENT OF ISSUES PRESENTED……………………………..     2

STATEMENT OF THE CASE……………………………………….....     2

STATEMENT OF FACTS………………………………………………..     3

SUMMARY OF ARGUMENT………………………………………....     18

STANDARD OF REVIEW……………………………………………….     20

ARGUMENT………………………………………………………………...     22

POINT I
A REASONABLE JURY COULD CONCLUDE THAT EASTWOOD'S
REMARKS EVINCE DISCRIMINATORY ANIMUS AND THAT THE
SAME SUBSTANTIALLY MOTIVATED HIS DECISION TO
RECOMMEND GREENE'S TERMINATION AND, THUS, THAT
GREENE ESTABLISHED HER *PRIMA FACIE* CASE…………………..     23

POINT II
A REASONABLE JURY COULD FIND THAT THE DISTRICTS'
ASSERTED REASONS FOR TERMINATING GREENE ARE A POST
HOC, PRETEXTUAL RATIONALIZATION TO COVER FOR
EASTWOOD'S TRUE DISCRIMINATORY MOTIVATION…………...     40

CONCLUSION……………………………………………………………     44

CERTIFICATE OF COMPLIANCE…………………………………...     46

SPECIAL APPENDIX………………………………………………………     SA-1

# TABLE OF AUTHORITIES

## Cases

Abrams v. Dep't. of Pub. Safety,
    ---F.3d---, No. 13-111-cv, 2014 WL 4191178 (2d Cir. 2014)…….. 30, 31, 32, 41

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)……………………………………….... 20, 21, 26, 27, 30

Back v. Hastings on Hudson Union Free Sch. Dist.,
    365 F.3d, 107 (2d Cir. 2004)……………………………….. 28

Bickerstaff v. Vassar Coll.,
    196 F.3d 435 (2d Cir. 1999)………………………………... 28

Danzer v. Norden Systems, Inc.,
    151 F.3d 50 (2d Cir. 1998)………………………………... 21, 26

Dister v. Cont'l. Group, Inc.,
    859 F.2d 1108 (2d Cir. 1988)……………………………..

Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty.
Adolescent Program, Inc.,
    198 F.3d 68 (2d Cir.1999)………………………………... 22, 24

Henry v. Wyeth Pharmaceuticals, Inc.,
    616 F.3d 134 (2d Cir. 2010)………………………………… 27

Holcomb v. Iona College,
    521 F.3d 130 (2d Cir. 2008)………………………………… 20, 21

Holtz v. Rockefeller & Co., Inc.,
    258 F.3d 62 (2d Cir. 2001)……………………………….. 23, 40

ITC Ltd. V. Punchgnini, Inc.,
    482 F.3d 135 (2d Cir. 2007)………………………………… 22

Kirkland v. Cablevision Systems,
    ---F.3d---, No. 13-3625-cv, 2014 WL 3686090 (2d Cir. 2014)...... 30, 33, 34, 39, 44

McDonnell Douglass Corp. v. Green,
    411 U.S. 792 (1973)................................................ 22, 23

Nagle v. Marron,
    663 F.3d 100, 117-18 (2d Cir. 2011)............................... 36

Parker v. Columbia Pictures Industries,
    204 F.3d 326 (2d Cir. 2000)....................................... 40

Patrick v. LeFevre,
    745 F.2d 153 (2d Cir. 1984)....................................... 21

Patrick v. Ridge,
    394 F.3d 311 (5th Cir. 2004)...................................... 32

Reeves v. Sanderson Plumbing Products, Inc.,
    530 U.S. 133 (2000)............................................... 21, 23, 42, 43

Savino v. Town of Southeast,
    983 F.Supp.2d 293 (S.D.N.Y. 2013)................................ 22

Savino v. Town of Southeast,
    ---Fed.Appx.---, No. 13-4239-cv, 2014 WL 3036081
    (2d. Cir. Jul. 7, 2014)........................................... 22

Schiano v. Quality Payroll Sys.,
    445 F.3d 597 (2d Cir. 2006)....................................... 21

Tomassi v. Insignia Financial Group, Inc.,
    478 F.3d 111 (2d Cir. 2007)....................................... 27, 29, 39, 44

**Statutes**

28 U.S.C. § 1291................................................... 2

28 U.S.C. § 1331................................................... 2

42 U.S.C. §12101………………………………………………..  1

42 U.S.C. §12102(1)……………………………………………  6, 24

42 U.S.C. §12102(2)……………………………………………  6, 24

42 U.S.C. §12111(2)……………………………………………  24

42 U.S.C. §12112(a)……………………………………………  22

42 U.S.C. §12117(a)……………………………………………  2

42 U.S.C. §2000e-5(f)………………………………………...  2

**Federal Rules**

Fed. R. App. P. 4(a)(2)………………………………………..  2

Fed. R. Civ. P. 56(a)…………………………………………..  20

## PRELIMINARY STATEMENT

By and through her counsel, SUSSMAN AND WATKINS, Plaintiff-Appellant JESYCA GREENE respectfully submits this brief in support of her appeal from the Opinion and Order of the District Court for the Southern District of New York, which granted summary judgment to Defendant-Appellant ENLARGED CITY SCHOOL DISTRICT OF MIDDLETOWN, NEW YORK (the "District") and final judgment dismissing her wrongful termination claim under the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. § 12101 *et seq.*

Greene is disabled in that her left arm has been amputated and she does not have a left hand.  During a meeting with the District's Superintendent, Dr. Kenneth Eastwood, to discuss an unfounded charge of plagiarism against her, Eastwood advised Greene she was suspended without pay and that he intended to recommend her termination to the District's Board of Education at its next meeting.  In doing so, Eastwood, staring at Greene's amputated arm, and, thus, directly correlating his ensuing remarks to her disability, exclaimed "you are one of those poor woe is me types" and that he never would have hired her if it were up to him.

A reasonable jury could find that Eastwood's comments are probative of his discriminatory intent and that he was substantially motivated by this demonstrated animus toward Greene's disability when deciding to recommend her termination to the Board, especially as the record demonstrates that the District's asserted non-

1

discriminatory reasons for its action are founded and a post-hoc rationalization upon which Eastwood, in fact, did not base his actual decision. Thus, the district below erred in finding otherwise and granting summary judgment and this Court, respectfully, should reverse and vacate that judgment and remand the matter for trial.

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

As Greene's claim arises under the ADA, the district court below had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §§ 12117(a) and 2000e-5(f). After the district court granted the District's motion for summary judgment on April 29, 2014 Greene timely filed her Notice of Appeal on May 20, 2014, providing this Court with jurisdiction pursuant to 28 U.S.C. § 1291.[1]

## STATEMENT OF ISSUES PRESENTED

(1) Whether Eastwood's remarks raise an inference of discrimination sufficient to establish Greene's *prima facie* case where a reasonable jury could find his remarks referenced Green's disability because, *inter alia*, (a) saying that someone is a "poor woe is may type" implies the person feels sorry for themselves or seeks sympathy, a common stereotype of disabled persons; (b) he was staring at her amputated arm when he made this statement; and (c) he did not personally interview Greene and

---

[1] Though Greene filed her Notice of Appeal prior to the Court's entry of final judgment dismissing her complaint on May 20, 2014 (see JA-7, Doc. Nos. 46 and 47), her Notice of Appeal is deemed to be filed "on the date of and after the entry" of final judgment. See Fed. R. App. P. 4(a)(2).

was not aware of her disability at her time of hire, thus correlating his remark that he would not have hired her if up to him to her disability.

(2) Whether the record contains sufficient evidence from which a reasonable jury could find the District's asserted non-discriminatory reasons to be pretext where the record demonstrates that (a) Eastwood made his decision to recommend Greene's termination without personal knowledge of her alleged performance deficiencies and without any substantive input or encouragement from Greene's supervisors and (b) her alleged performance deficiencies, in fact, were unfounded.

## STATEMENT OF THE CASE

This is an appeal from the district court's April 29, 2014 Opinion and Order granting summary judgment to the District and May 20, 2014 final judgment dismissing Greene's ADA claim.

Greene was hired by the District in November 2008 as a Technology Integration Coach. Prior to joining the District, she had lost her lower left arm, including her entire left hand, as a result of complications from bariatric surgery, a disability that substantially impairs her major life activities. Thus, she is disabled within the meaning of the ADA and this was not contested below.

Despite Greene's satisfactory job performance, her supervisors unjustifiably reprimanded and counseled her and issued unfounded negative evaluations culminating in her complaint of harassment against these same supervisors in

January and March of 2011. Toward the end of the same semester, one of Greene's supervisors, a subject of appellant's complaint, issued a counseling letter charging her with plagiarism, a baseless accusation that is refuted by the documentary evidence.

Despite the objective unreasonableness of this charge and his failure to even attempt to obtain appellant's explanation of the situation, Superintendent Eastwood suspended Greene without pay and advised her that he intended to recommend her termination to the Board of Education. At this meeting, while ogling her visibly amputated arm, Eastwood told Greene she is "one of those poor woe is me types" and indicated he would never have hired her if it were up to him. Of course, these comments refer to her disability, as demonstrated by their content, Eastwood's contemporaneous glaring at her amputated arm and the fact that he did not personally interview Greene upon her hiring and, thus, did not know about her disability at that time.

As he advised Greene on April 13, 2011, Eastwood, indeed, recommended her termination to the Board of Education at its May 18, 2011 meeting and the Board adopted his recommendation. By letter dated May 19, 2011, the District notified Greened of her termination

Greene commenced this action on June 11, 2012[2] seeking damages for the District's violation of her rights under the ADA by wrongfully terminating her probationary employment on the basis of her disability (JA 1, Doc. No. 1; JA-8-23). On December 13, 2013, the District moved for summary judgment (JA-5, Doc. No. 30; JA-33-34).

By Order and Opinion dated April 29, 2014, the district court (Hon. Denise L. Cote, U.S.D.J.) granted the District's motion for summary judgment, holding that Greene failed to establish a *prima facie* case of disability discrimination because she could not demonstrate the requisite inference that her discharge was *because of* her disability (JA-7, Doc. No. 45; SA *passim*).  In so holding, the court concluded that Eastwood's comments could not reasonably be interpreted as demonstrating discriminatory intent (SA-11-13).  Finally, the district court held that, even if Greene could establish her *prima facie* case, the District established a legitimate, non-discriminatory reason for its decision to terminate her and Greene presented insufficient evidence from which a reasonable jury could find the same is pretext for disability discriminatory (SA-13-14).

---

[2] Greene initially commenced this action on April 4, 2012 (12-CV-2592 (ER)) and then, inadvertently, commenced again on June 11, 2012 (12-CV-4545 (DLC)) (see JA-727-28 at ¶ 3; JA-869-62). The district court suggested that the first action be voluntarily discontinued and the matter proceed under the second commencement, and that is the course Green pursued (see JA-727-28 at ¶ 3; JA-937-40).

5

Greene timely filed her Notice of Appeal on May 20, 2014 (JA-7, Doc. No. 46; JA-1101) and the clerk of the district court thereafter entered final judgment that same day (JA-7, Doc. No. 47; JA-1100).

## STATEMENT OF FACTS

Greene was hired by the District in November 2008 as a Technology Integration Coach for a three year probationary period, at the end of which she would be granted or denied tenure (JA-606). Prior to her employment with the District, she lost the lower portion of her left arm, including her entire left hand, to amputation as the result of complications from bariatric surgery (JA-962-63 at ¶ 22). She also suffers from carpal tunnel in her right [and only] hand (Id.). These disabilities substantially impair her major life activities and below, appellee did not contest her status as a "person with a disability" as defined by the ADA (Id.). See 42 U.S.C. § 12102(1)-(2).

When Greene sought employment from the District, Mike Tuttle and Amy Creeden interviewed her for the position (JA-132). Tuttle was the District's Chief Technology Officer and Creeden another Technology Integration Coach (JA-679 at ¶ 4; JA-684 at ¶ 2; JA-685 at ¶ 6). Tuttle told Greene he "had not been able to find the right person [for the job] for a very long time until he had met me" (JA-138).

Thereafter, Tuttle recommended to Eastwood, who was not otherwise involved in the interview process, that the District hire Greene (JA-JA-679 at ¶¶ 4-

5).  Without interviewing Greene himself or having any contact with her, Eastwood accepted Tuttle's recommendation and, in turn, recommended to the Board that the District hire Greene, which accepted the same and hired her (JA-606; JA-679 at ¶¶ 5-6).  Greene commenced her employment on November 3, 2008 (JA-606).

As a Technology Integration Coach, Greene's job duties entailed, *inter alia*, assisting teachers to incorporate and integrate technology into their classroom instruction through direct coaching and working with administrators and other staff, as well as making SMART Board lessons for teachers and coming up with different types of technology resources relevant to teachers' lessons (JA-146-47; JA-1071-73; SA-2).  Greene met all minimum qualifications for the job, was competent to hold the position and performed the required duties (JA-965 at ¶ 33; JA-1071-73).

When she commenced her employment with the District, Greene reported directly to Tuttle (JA-680 at ¶ 7).  After seven months of employment, Greene received a favorable performance evaluation from Tuttle on June 1, 2009 (JA-613).

During the first month of the 2009-2010 school year, Tuttle set quotas requiring Greene to assist a certain number of teachers (twenty) and administrators each month to integrate technology into their pedagogy or supervision (JA-217). When Tuttle implemented these quotas, Greene was in the process of implementing another district priority, Prosper, a computer program that allowed teachers to

7

correlate the test results of their students to specific state standards and, thus, identify where individual students demonstrated deficiencies (JA-174-77).

Tuttle assigned Greene the Prosper assignment in May 2009; however, as Greene was a ten-month employee, she needed to receive permission from the District to work over the summer on this initiative (JA-963 at ¶ 25). She received this permission, but, during that summer she contracted Lyme's disease, which significantly slowed her progress on the assignment (Id.). She communicated this to Tuttle by email in the first months of the 2009-2010 school year (JA-976-78). Greene also reported to Tuttle that, due to problems in the Prosper software, she and a technology assistant needed to spend far more time than anyone expected inputting the specific state standards for each grade (JA-174-77; JA-976-78). She requested guidance from Tuttle as to the department's priorities and received no constructive response, just a directive to cover all assignments, including Prosper and the quotas (JA-976-78).

Thereafter, though she missed the twenty-session teacher quota in September 2009, without dispute, Greene successfully met the quotas assigned her and the record reflects no complaints from any teacher or administrator about the quality of assistance she provided (JA-976). Indeed, Eastwood testified that, from 2008 to 2011, he was pleased by the technology department's progress infusing technology into the District's classrooms (JA-751-52).

Despite her positive start, Greene received unfavorable evaluations from Tuttle in December 2009, March 2010 and June 2010 (JA-614-19; JA-625-26). She also received a letter of counsel from Tuttle on June 24, 2011 (JA-627). She drafted and submitted contemporaneous rebuttals to each of these [and other] evaluations and letter of counsel refuting as unfounded or otherwise providing reasonable explanations for the negative comments (JA-969-74; JA-981-86; JA-987-88; JA-991-94; JA-995-1041; JA-1047-61).

As of January 1, 2011, as a result of reorganization of the IT department, Creeden took over as Greene's direct supervisor (JA-156). On January 6, 2011, Tuttle called Greene into her office to ask if she was paying her personal bills while at work (JA-852). When she denied this, he told her he had a picture of her desk, which shows her checkbook and bills on it (Id.). According to Greene, she typically spilled the contents of her purse onto her desk when she arrived at work each morning, which sometimes includes these items. This explained why these items might have been on her desk (JA-854).

During the District's internal investigation, Tuttle and Creeden admitted that Creeden took the picture of appellant's desk and sent it Tuttle (JA-855-59). Creeden did this after Greene made formal complaint of harassment against her and Tuttle, a course Eastwood advised appellant to take after she raised the issue at a January 11, 2011 meeting. (JA-410; JA-JA-629; JA-850-62). That investigation concluded that

Tuttle and Creeden acted inappropriately and should be formally counseled for their misconduct, but that they did not violate the District's anti-harassment policy (JA-630; JA-860-62).

At the January 11, 2011 meeting between Eastwood and Greene, at which Greene's union representative Ms. Esposito was present, Eastwood did not raise any concerns about her work performance (JA-415). Before the January 11, 2011 meeting, Eastwood claims to have not been concerned about Greene's tenure. He did not ask for the meeting nor have any intention of doing so (JA-758, JA-760, JA-763). Before the meeting Greene requested commenced, Eastwood had no agenda (JA-770), had not spoken with Tuttle about Greene (JA-769) and had not reviewed any documents pertinent to Greene's employment (Id.).

Eastwood's account of this meeting at his deposition is entirely fallacious and inconsistent with his own writing about the incident. In sworn testimony, he claims he spent "an hour to an hour and a half listening to Ms. Greene tell me why everyone else is responsible for her lack of performance (JA-769), yet this alleged "hour to an hour and a half" diatribe is not mentioned once in his contemporaneous writing about the meeting. (JA-628). Indeed, there was no discussion of Greene's job performance at the meeting. Nor did Eastwood make any comment about her tenure status (JA-415).

In his own account of the meeting, Eastwood reviewed Greene's evaluations at the meeting and asked her questions about her performance; yet he remembered none of his questions nor any of her remarks (JA-760-61). He claimed she blamed Tuttle for her own lack of performance but could remember nothing she said at this meeting specifically about Tuttle (JA-762). This account is entirely fabricated as no such discussion occurred at the January 2011 meeting (JA-415).

Likewise, Eastwood's January 20, 2011 letter to Greene, which allegedly recapitulated the sum and substance of the January 11 meeting, was materially false; Eastwood wrote in the first paragraph of that letter, "The meeting of January 11, 2011 was the most recent in a number of meetings that you, your union representative, and I have had to discuss the district's overview of your job performance" (JA-628). Yet, at deposition, under oath, Eastwood stated that, before the January 11, 2011 meeting, he had never initiated a meeting with Greene to discuss her job performance (JA-774-77). And, he produced no documents from any pre-January 11, 2011 meeting he attended concerning Greene (JA-776).

Indeed, the first Eastwood heard about any issue with Greene in her department came from union president Esposito, who told Eastwood that Greene was having issues with her supervisor and wanted to meet with him (JA-747-78). The only issue Eastwood knew about relating to Greene prior to this was some problem "getting evaluations [of her] completed because she was absent in the 2010-

11

2011 school year (JA-748). Tuttle advised Eastwood that he was having a problem getting Greene's signature on her evaluations (JA-748-49). At his deposition, Eastwood could not recall any discussion with Tuttle about the substance of Greene's evaluations (JA-749-50).

At the January 11, 2011 meeting, Esposito and Greene raised issue with language in evaluations Greene received, and, after they raised this issue, Eastwood realized he needed to see those evaluations (JA-750-51). In short, Eastwood's deposition testimony undercuts any claim that he came to the January 11, 2011 meeting prepared to discuss plaintiff's performance issues in any way, especially in light of Greene's testimony that no such discussion ever took place at the meeting.

After learning that Green had filed a complaint against her for breach of the District policy of photographing another's work space in January 2011, Creeden performed two observations of Greene (JA-633-41; JA-654-61). While vehemently disputed by Greene, both concluded that Greene performed unsatisfactorily (Id.). Between these two observations, Creeden requested that another administrator, which whom she was close friends, perform an allegedly neutral evaluation of Greene (JA-646-53). Greene contemporaneously complained that the selected observer was anything but neutral, but the observation proceeded. This administrator found Greene's performance – in assisting another professional to infuse technology in her class – unsatisfactory (Id.). Again, Green

12

contemporaneously disputed this observation and claimed it contained materially false statements (JA-995-1026).

After the District notified Greene that its internal investigation found her harassment complaint unsubstantiated, Greene lodged a second harassment complaint on or about March 28, 2011 (JA-631).  Within a few days of that complaint, on or about April 4, 201, Creeden accused Greene of plagiarism during an April 1, 2011 classroom observation (JA-675).  Creeden claimed that, without attributing the sources which created it and claiming it to be her own, Greene had given to a teacher she was assisting a two-page document defining certain terms used in "blogging" (Id.).  Greene denied that she had ever taken credit for creating this sheet, which merely listed commonly used definitions, and denied that, by failing to attribute the sources of the definitions on the document itself, she engaged in any form of plagiarism (JA-961-62 at ¶¶ 14-17; JA-1061).  And her pre-coaching sheet for this training cites her sources (JA-961 at ¶ 14; JA-1046).  Creeden issued Greene a formal counseling memorandum regarding this incident on April 11, 2011 (JA-675).

On April 13, 2011, Eastwood called Greene to his office and handed her a letter suspending her indefinitely without pay (JA-677; JA-784).  Eastwood's testimony concerning this April 13, 2011 meeting is fabricated; at deposition, he claims that he told Greene at this meeting that the reason she was beings suspended

was because of plagiarism (JA-787-88).  He also testified that, before this meeting, he had not decided to recommend to the board that she be terminated (JA-789-90).

When asked whether he had ever spoken with Greene before this meeting at which he told her he was suspending her for plagiarism about the underlying events, Eastwood testified, "That's probably what part of the meeting was about, to get her understanding of what the accusations of plagiarism were against her" (JA-788).  He then testified as follows: "Q: So before you told her she was suspended, you asked for her side of the story? A: Yes. Q: What did she tell you? A:   Specifically,       I cannot remember . . . ." (JA-788).

In fact, at the April 13 meeting, Eastwood presented plaintiff with a letter telling her she was being suspended; he never asked for her account of what occurred before giving her this letter and the letter does not mention plagiarism (JA-677; JA-962 at ¶ 21).  Moreover, the District's privilege log demonstrates that this letter was in the works since as early as April 8, 2011, five days prior to the meeting (JA-921-22 [see Doc. Nos. 8(A) and 8(B), Bates Nos. DIST 000042-42]).

Eastwood obviously made the decision to terminate Greene before meeting with her and before obtaining her side of the story and falsely testified to the contrary at his deposition (see JA-677 [bearing Eastwood's handwritten note, which reads: "Meeting held on April 13, 2011, at 9:30, original of this letter personally given to

employee]; JA-791; JA-921-22 [see Doc. Nos. 8(A) and 8(B), Bates Nos. DIST 000042-42]).

Eastwood claims that, before this meeting with Green, Creeden told him that Greene had told the classroom teacher that the two page "blogging" definition page was her own work (JA-794). Eastwood never spoke with the classroom teacher to confirm or verify Creeden's account (JA-795). When he spoke with Greene, Eastwood admits that she denied making any such statement to the classroom teacher (Id.). Greene has repeated that denial below and, in fact, never made such statement taking credit for the work (JA-961-62 at ¶¶ 14-17; JA-1061).

Eastwood also initially presented the erroneous claim that the definition document Greene gave to the teacher was a document Greene "used to present to the class" (JA-796). When challenged on this testimony, he did not know whether the document was presented to the class or know it was provided by Green "to the teacher" (Id.).

At the April 13, 2011 meeting, while contemporaneously staring directly at Greene's amputated arm, Eastwood told Greene: "You're one of those poor woe is me types" and that he never would have hired her if it were up to him (JA-346; JA-802; JA-962 at ¶ 20). Greene believed that Eastwood was making a reference to her disability, her amputated arm, which disallows her from engaging in normal life

activities.  Eastwood claims he was referring to her attitude of "blaming others" for her errors (JA-802), an attitude she denies ever displaying in his presence.

Greene requested a written explanation of Eastwood's reasons for her termination and, by letter dated April 15, 2011, the District provided her a letter setting forth thirteen "reasons" or "incidents" (JA-620-23).  At his deposition, Eastwood claimed to have written the letter (JA-803).  Yet, he was also unable to support the bulk of these reasons from his own personal knowledge and Greene has denied that nearly all of these events happened.

For instance, at his deposition, Eastwood was asked about the information underlying the various claims set forth in the April 15, 2011 letter (JA-804-19).  Paragraph 1 accuses Greene of failing to bring three emerging technology trends to the attention of her supervisor, Tuttle (JA-620); when asked what trends he was referring to, Eastwood did not know (JA-816).  Referring to paragraph 3 and a comment Greene allegedly made about having issues with taking directions from a supervisor (JA-621), Eastwood never heard Greene state this, but claims he said those words to her (JA-817).

Paragraph 8 accuses plaintiff of failing to effectively communicate concerns and/or problems with Prosper Assessment and Smart Table projects (JA-622).  Eastwood did not specifically know who Greene had allegedly failed to effectively communicate with (JA-813).

Paragraph 9 claims that Greene failed to "accept advice and suggestions for professional improvement" (JA-622). But, Eastwood had no knowledge of which courses/classes plaintiff did take responsive to her supervisors' suggestions (JA-813). The same paragraph includes a detailed description of a meeting allegedly held on January 25, 2010 between plaintiff and Tuttle and a request Tuttle made of plaintiff at this meeting (JA-622); Eastwood had no firsthand knowledge of this and never spoke with Greene about it (JA-814). Likewise, Eastwood never heard other statements he attributes in his letter to Greene and could not recall the source of the statements in his letter (JA-816). Eastwood never spoke with Greene about any of these statements (JA-816-17).

The source of the allegation repeated in paragraph 10 is Creeden but Eastwood could not remember speaking with her about the contents of that paragraph (JA-622, 812).

Eastwood had no personal knowledge of any of the alleged events described in paragraph 11 [JA-622-23] and never spoke with Greene about the allegation that she arrived late on various occasions (JA-804-05).

With regard to Paragraph 12 (JA-623), Eastwood was not present for any of the comments attributed therein to Greene, did not know when the comments were allegedly made and never spoke with Greene about any of the allegations (JA-805-06).

With reference to the staff who allegedly witnessed any of the alleged conduct, Eastwood could not identify them and, again, he never spoke with Greene about any of these incidents (JA-806-07).  With regard to the claim in Paragraph 12 that Greene had been unprofessional toward Ms. Hasbrouck (JA-623), Eastwood had never spoken with either Hasbrouck or Greene about the alleged incident (JA-810).

Though he claimed to have received no input from Creeden concerning Greene's termination and to have, himself, written the April 15, 2011 letter, the documentary record shows that, in fact, Eastwood relied entirely upon Creeden and District counsel to compose the letter explaining the reasons for her termination, had virtually no independent knowledge supporting the content thereof and provided no meaningful substantive input thereto (JA-950-55).

On May 18, 2011, Eastwood recommended Greene's termination to the Board of Education and the Board ratified the same (JA-678).  By letter dated May 19, 2011, the District so notified Greene of this decision and that her employment was terminated effective June 20, 2011 (Id.)

## SUMMARY OF ARGUMENT

The district court below erred by disregarding the appropriate summary judgment standard of review and holding, as a matter of law, that Eastwood's comments, even when coupled with his contemporaneous glaring at Greene's

amputated arm, were insufficient to raise an inference of disability discrimination, and, thus, that Greene failed to establish her *prima facie* case.

Indeed, on this record, a reasonable jury could plausibly disagree with the Court's conclusion. Specifically, a reasonable jury could find that Eastwood's "poor woe is me comment," is probative of discriminatory intent, especially in light of his contemporaneous ogling of Greene's amputated arm, and that this disability-based animus substantially motivated his decision to recommend her termination. This is especially so given Eastwood's other contemporaneous remark that he would never have hired her if it were up to him, which the district court did not even address.

Moreover, on this record, a reasonable jury could find that Eastwood did *not* rely on any of the "reasons" or "bases" later delivered to Greene by the District as justifying her termination and that his decision was not informed by Creeden or Tuttle, thus further supporting the inference that his discriminatory animus truly motivated his action. Moreover, as the district court [at least implicitly] recognized, a reasonable jury could find from this record that Green performed her job duties well and that her supervisors' unfavorable reviews and complaints, upon which its asserted non-discriminatory reasons are based, were unfounded, and, thus, that the District's proffered explanation for its decision is false.

In sum, a reasonable jury could find that Greene's evidence adequately raised an inference of discriminations, demonstrates pretext and established that her

disability substantially motivated Eastwood's decision to terminate her. Accordingly, the district court erred in holding, as a matter of a law, that this evidence could not support a jury verdict in Greene's favor and, consequently, its Order granting summary judgment should be reversed and vacated.

## STANDARD OF REVIEW

This court reviews the district court's grant of summary judgment de novo. See Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008). Summary judgment is appropriate only where the moving party establishes that there is no genuine dispute as to any material fact, entitling to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if its resolution could affect the outcome of the suit and a dispute is genuine if reasonable minds may differ as to its resolution. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If a reasonable jury could return a verdict for the non-moving party, then summary judgment is inappropriate and the court must deny the motion. See Id. at 250.

The court must view the record in the light most favorable to the non-moving party, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in [its] favor." See Holcomb, 521 F.3d at 137. The court's function "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." See Anderson, 477 U.S. at 249. Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions . . . ." Id. at 255.  And "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." See Danzer v. Norden Systems, Inc., 151 F.3d 50, 54 (2d Cir. 1998).

Critically, the Court should review the record as a whole and, in doing so, "it must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000). As such, "the court should give credence to the evidence favoring the non-movant as well as the evidence supporting the moving party that is contradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id.

Finally, this Court has long cautioned against granting summary judgment in discrimination cases which typically turn on the issue of intent.  See Holcomb, 521 F.3d at 137.  Indeed, "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." Schiano v. Quality Payroll Sys., 445 F.3d 597, 603 (2d Cir. 2006) (internal quotations omitted).  Therefore, where, as here, intent is in issue, its resolution should be left to the jury. See Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir. 1984) ("This Court has consistently held where subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated,

summary judgment would appear to be inappropriate and a trial indispensable."); Savino v. Town of Southeast, 983 F.Supp.2d 293, 300-01 (S.D.N.Y. 2013), aff'd. by, ---Fed.Appx.---, No. 13-4239-cv, 2014 WL 3036081 (2d Cir. Jul. 7, 2014) (Summary Order) (collecting cases, including, ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 150 (2d Cir. 2007) ("[I]ntent is always a subjective matter of inference and thus rarely amendable to summary judgment.") (quotations & citations omitted))).

## ARGUMENT

The record in this case contains sufficient evidence from which a reasonable jury could find that Greene's disability was a substantial motivating factor in the District's decision to terminate her probationary employment and, thus, the district court erred in granting summary judgment and dismissing Greene's ADA claim.

Under Title I of the ADA, it is unlawful for a covered employer, such as the District, to fire a qualified employee with a disability, like Greene, because of that employee's disability. See 42 U.S.C. § 12112(a).[3] The District, here, violated this clear prohibition.

Greene's ADA claim is assessed under the familiar burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Heyman v. Queens Vill. Comm. for Mental Health for

---

[3] The text of the applicable statute reads: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

Jamaica Cmty. Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir.1999).  Under this rubric, a plaintiff must first establish a *prima facie* case, which creates a presumption of discrimination that the defendant may rebut by asserting a legitimate, non-discriminatory reason for its adverse action.  McDonnell Douglas, 411 U.S. at 802.  If the defendant meets its burden of production, the plaintiff must then demonstrate that defendant's asserted reason is just a pretext for unlawful discrimination.  See Id.

While a plaintiff may establish pretext by showing that the defendant's asserted reason was false and that the real reason was the plaintiff's protected-class status, see Reeves, 530 U.S. at 147-48, she is not required to disprove defendant's proffered reason.  See Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 81 (2d Cir. 2001).  Rather, a plaintiff need only establish that the impermissible consideration was a motivating factor in the defendant's adverse employment decision.  See Id.

## POINT I

### A REASONABLE JURY COULD CONCLUDE THAT EASTWOOD'S REMARKS EVINCE DISCRIMINATORY ANIMUS AND THAT THE SAME SUBSTANTIALLY MOTIVATED HIS DECISION TO RECOMMEND GREENE'S TERMINATION AND, THUS, THAT GREENE ESTABLISHED HER *PRIMA FACIE* CASE.

The record here supports Greene's *prima facie* case.  To establish a *prima facie* ADA claim, Greene must demonstrate that:

> (1) [her] employer is subject to the ADA; (2) [she] was
> disabled within the meaning of the ADA; (3) [she] was

> otherwise qualified to perform the essential functions of
> [her] job, with or without a reasonable accommodation;
> and (4) [she] suffered an adverse employment action
> because of [her] disability.

Heyman, 198 F.3d at 72.  The district court below assumed for purposes of the

District's motion that Greene established the first three prongs of her *prima facie*

case (SA-11) and, indeed, there is no real dispute that she has.  The District never

contested its coverage under the ADA and plainly meets the statutory definition of

"covered entity." See 42 U.S.C. § 12111(2).  Likewise, the District never disputed

that Greene is "disabled" within the meaning of the ADA.  Indeed, her lower left

arm is amputated [she lacks her entire left hand] and she has carpal tunnel syndrome

in her right [and only] hand (JA-962-63 at ¶ 22).  These disabilities significantly

impair her ability to perform manual tasks and to lift and carry items (Id.) and, thus,

substantially limit her in these major life activities. See 42 U.S.C. § 12102(1)-(2).

Moreover the record adequately demonstrates, and the District did not refute,

that Greene was qualified to perform the essential functions of her job as Technology

Integration Coach (see JA-965 at ¶ 33; JA-1071-73).  Indeed, she had performed

these duties for two-and-a-half years prior to termination despite not even having a

written job description for the first two years (see Id.).  Demonstrating such

minimum qualifications, and the ability to perform the same with or without a

reasonable accommodation is sufficient to establish the second *prima facie* prong.

The district court held, however, that Greene failed to establish the fourth prong of her *prima facie* case because she "failed to point to any evidence raising an inference that her discharge was *because of* her disability" (SA-11 [emphasis in original]).  This holding was erroneous and presents the primary issue on appeal.

In so holding, the district court concluded that Eastwood's remarks to Greene during the April 13, 2011 meeting were insufficient – as a matter of law - to raise the requisite inference of discrimination.  This was error because, as explained in more detail below, a reasonable jury could find such remarks probative of Eastwood's discriminatory animus.

In rejecting Eastwood's remarks as insufficient evidence of discriminatory intent, the district court committed two fundamental, and reversible, errors.  First, the district court failed to view the evidence in the light most favorably to Greene, as required by the applicable standard of review, and, instead, improperly resolved against Greene the material question of fact of whether or not Eastwood's remark was probative of disability-based discriminatory animus.  And, second, it conflated the theory of Greene's claim and erroneously faulted her for failing to provide evidence that Tuttle and Creeden discriminated against her on the basis of her disability, thus erroneously concluding that such failure, *ipso facto*, rendered Eastwood's remarks non-probative of discriminatory animus.

With respect to its first error, the district court improperly resolved against Greene the jury question of whether Eastwood's remarks demonstrate discriminatory intent, concluding:

> [T]his was a "stray remark" that is insufficient to establish a *prima facie* case of discrimination. The comment itself is "remote and oblique." It does not specifically reference her disability, even when considered with the assertion that Dr. Eastwood glanced at Greene's amputated limb when he said it. Rather it is a statement that refers far more directly to the long history of discord between Greene and her supervisors, and Greene's protests that her discharge is groundless. The comment does not "evince a discriminatory state of mind.

(SA-12 [citations omitted]). This is the district court's interpretation of Eastwood's comments; however, the court's function in reviewing a summary judgment motion "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." See <u>Anderson</u>, 477 U.S. at 249. And "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position, or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." <u>Danzer</u>, 151 F.3d at 54 (citations omitted).

Here, a reasonable jury plausibly could disagree with the court's conclusion and find that Eastwood's remarks *were* directly related to her disability and to her termination and reject Eastwood's post-hoc, self-serving rationalization, accepted by

the district court below. See Anderson, 477 U.S. at 248 (noting that a dispute is genuine if reasonable minds may differ as to its resolution). In evaluating the probative value of a given remark, this Court has instructed that:

> The more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove the action was motivated by discrimination. . . . The more a remark evinces a discriminatory state of mind, and the close the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be. . . . The relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class.

Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 115-16 (2d Cir. 2007). And this Court has recognized four non-dispositive factors to aid in this analysis:

> In determining whether a remark is probative, [courts] have considered four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

Henry v. Wyeth Pharmaceuticals, Inc., 616 F.3d 134, 149-50 (2d Cir. 2010).

Here, application of the four Wyeth factors demonstrates the strong probative value of Eastwood's remarks in demonstrating his discriminatory animus.[4] First,

---

[4] Notably, although the district court below cited the Wyeth factors in setting forth the applicable legal framework, it did not analyze Eastwood's remarks under this rubric (see SA-10-13).

Eastwood was the decision-maker with respect to Greene's tenure and termination. To be sure, the Board of Education had to approve this decision, but it did so based entirely upon Eastwood's recommendation, which he made on his volition and which tainted the Board's final determination with his animus. See Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d, 107, 125-26 (2d Cir. 2004) ("[I]mpermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision . . . even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the . . . process." (quoting Bickerstaff v. Vassar Coll., 196 F.3d 435, 450 (2d Cir. 1999))).  In New York, a teacher may not be tenured without the Superintendent's positive recommendation.

Second, Eastwood made these remarks in extremely close temporal proximity to his decision to recommend Greene's termination.  Indeed, he made the comment during the meeting at which he advised Greene of his decision.  This meeting took place on April 13, 2011 and, as readily inferred from the District's privilege log, which references emails from April 8, 2011 between Eastwood and District counsel regarding "Termination of Plaintiff's probationary employment, counseling memorandum and attached draft termination letter" (JA-921-22 [see Doc. Nos. 8(A) and 8(B), Bates Nos. DIST 000042-42]), he made this decision on or around April 8, 2011, just five days prior to his meeting with Greene.  Construing this evidence

in Greene's favor, a rational juror could conclude that his remarks evidenced his true motivation for his decision, which made just days prior and contemporaneously communicated to Greene at the time of his comments.

Third, a reasonable jury could view Eastwood's remarks as discriminatory. In this regard, this Court's explanation in <u>Tomassi</u> is instructive – "The relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." <u>Tomassi</u>, 478 F.3d at 116. Here, a reasonable jury could find that Eastwood's comments to Green that she is "one of those poor woe is me types" and that he would not have hired her if it were up to him, while contemporaneously ogling her visibly amputated arm, demonstrate his "assumptions and attitudes relating" to her disability and that his remarks, in fact, referenced her disability.

More specifically a reasonable jury could find that, by referring to Green as a "poor woe is me type," Eastwood was implying that she feels sorry for herself, has self-pity or seeks sympathy, which are common stereotypes of persons with disabilities.

Moreover, contrary to the district court's conclusion, a reasonable jury could find the fact that Eastwood stared at Greene's amputated limb at the precise moment he uttered his remarks demonstrates that he meant the remark to be about her

disability. Indeed, a reasonable juror, employing her common sense and drawing from her life experiences, as jurors are typically instructed to do, could conclude that, when using innuendo, people typically use body language or other visual cues to imbue the same with its intended meaning. Ultimately, the import of Eastwood's contemporaneous ogling of Greene's amputated arm when making his comments is quintessentially a fact question exclusively suited for a jury to determine. See Anderson, 477 U.S. at 255 ("[T]he drawing of legitimate inferences from the facts are jury functions . . . .").

Finally, a jury could interpret that Eastwood's comment that he would not have hired her if it were up to him as relating to her disability. This fact can be inferred from the very irony of which the statement wreaks – indeed, the decision *was* up to Eastwood. It was he who made the decision to recommend her hiring to the Board of Education and he did so based upon Tuttle's recommendation. Thus, a reasonable jury could infer that by saying "if it were up to me," he really mean, "if I had interviewed you and observed your disability."

In evaluating this evidence, this Court's recent decisions in Abrams v. Dep't. of Pub. Safety, ---F.3d---, No. 13-111-cv, 2014 WL 4191178 (2d Cir. 2014) and Kirkland v. Cablevision Systems, ---F.3d---, No. 13-3625-cv, 2014 WL 3686090 (2d Cir. 2014) further support Greene's position that Eastwood's remarks constitute sufficient evidence of discrimination to survive a motion for summary judgment.

In Abrams, an African American DPS detective claimed that the defendant's refusal to assign him to a more favorable special unit [known as the "Van"], an assignment for which he qualified and to which he applied, but was denied, on numerous occasions, was based on his race in violation of Title VII and the Equal Protection Clause of the Fourteenth Amendment. See Abrams, 2014 WL 4191178 at *1-*2. All of the members of the Van unit were white. Id. at *2.

As evidence of discriminatory intent, Abrams proffered comments by members of the department that another [white] detective was "a better fit" for the Van unit than Abrams and that Abrams "did not fit in." See Id. In granting summary judgment to defendants on Abrams' race discrimination claims, the district court rejected the "fitting in" statements as insufficient evidence of discriminatory animus to demonstrate pretext, "stating that there is insufficient evidence to permit a finding that 'fitting in' referred to plaintiff's race." Id. at *6 (citations omitted).[5]

This Court reversed the district court's holding and vacated its grant of summary judgment to defendants. In doing so, the Court first noted that the testimony of one of the witnesses that it "crossed his mind" that the detective who said another candidate was "a better fit" related to plaintiff's race "belies the

---

[5] The district court also rejected the comments on hearsay grounds, but this Court reversed that holding. See Abrams, 2014 WL 4191178 at *6.

31

[district] court's ultimate conclusion that no question of fact could exist in the mind of a reasonable juror on the issue of pretext." Id.

The Court also cited the Fifth Circuit's holding in Patrick v. Ridge, 394 F.3d 311 (5th Cir. 2004) for the proposition that "a hiring official's subjective belief that an individual would not 'fit in' or was 'not sufficiently suited' for a job is at least as consistent with discriminatory intent as it is with nondiscriminatory intent:  The employer just might have found the candidate 'not sufficiently suited' *because of* a protected trait such as age, race, or engaging in a protected activity." Id. at *6-*7 (quoting Patrick, 394 F.3d at 317) (emphasis in original).

Thus, this Court, adopting the Fifth Circuit's reasoning in Patrick, concluded: "The phrasing 'better fit' or 'fitting in' *just might* have been about race; and when construing the facts in a light most favorable to the non-moving party, those phrases, *even when isolated*, could be enough to create a reasonable question of fact for a jury.  It is enough ambiguity to create a reasonable question of fact. Id. at *7 (first emphasis in original; second emphasis added).

Likewise, in this case, though a jury plausibly might agree with the district court that Eastwood's remarks did not relate to Greene's disability, when viewed in the light most favorably to Greene, a reasonable jury might - just as plausibly - find that his comments "just might have been about" her disability. See Id. Thus, as in Abrams, there is "enough ambiguity to create a reasonable question of fact." See Id.

In <u>Kirkland</u>, the plaintiff claimed that his employer fired him on the basis of his race in violation of Title VII. <u>See</u> <u>Kirkland</u>, 2014 WL 3686090 at *1. The district court found that he established a *prima facie* case, but granted summary judgment to the defendant on the ground that he failed to establish the defendant's asserted non-discriminatory justification – poor work performance – was pretext for race discrimination. <u>See</u> <u>Id.</u> at *2.

Citing and applying the established summary judgment standard, this Court reversed the district court, explaining that the lower court "overlooked evidence raising a genuine factual dispute as to whether [defendant's] justifications for firing [plaintiff] were pretext" and that "[a] rational jury, viewing the disputed evidence in [plaintiff's] favor could find [defendant] discriminated against [him] and fired him in violation of Title VII." <u>Id.</u> at *1.

In doing so, the Court outlined plaintiff's evidence of race discrimination, which included, *inter alia*, several facially-ambiguous remarks. <u>See</u> <u>Id.</u> at *2-*3. For instance, the record contained evidence that plaintiff's former supervisor criticized him for failing to discipline one of his regional managers, all of whom were African-American, and commented to plaintiff's replacement that "they don't know how to police each other." <u>Id.</u> at *2. The supervisor also remarked that the regional office could "lighten up a bit." <u>Id.</u> In addition, the plaintiff swore that, when giving a visual presentation, his supervisor criticized him for "us[ing] a colored background and

[stated that] there is no room for color in a business presentation and how white was better than color." Id.

> This Court cited other evidence of pretext and concluded:

>> A jury might credit all of this proffered evidence, some of it, or none at all. But that is left for the jury to decide at trial. And if at least some of this evidence is believed by a jury, that jury could also conclude that, despite [plaintiff's] negative performance reviews, his firing was more likely than not based in whole or in part on discrimination . . . .

Id. at *4 (quotations & citations omitted). Thus, while the Court's holding did not rely solely on the foregoing comments, its import is that these remarks are sufficiently probative of racial animus – i.e., that a reasonable jury could conclude these remarks demonstrate discriminatory intent.

The comments at issue in Kirkland, like Eastwood's remarks here, are somewhat facially ambiguous – by saying "they don't know how to police each other," and that the office could "lighten up," the supervisor did not explicitly refer to the plaintiff's and his subordinates' race just like Eastwood did not explicitly refer to Greene's disability here. But just like that supervisor's innuendos were imbued with meaning by the fact that the plaintiff and his subordinates were all African American, a reasonable jury could find that Eastwood imbued his remarks with discriminatory meaning by glaring directly at Greene's amputated arm when uttering the same.

Similarly, just as this Court in <u>Kirkland</u> considered the supervisor's criticism of plaintiff's use of a "colored background" in his visual presentation to present a genuine issue of fact for a jury to determine whether the comment was benign or a subtle reference to plaintiff's race, so too is the question of whether Eastwood's remark in this case is a benign reference to Eastwood's perception of Greene's history of discord with her supervisors and denials of wrongdoing or, instead, a subtle reference to her disability.

Finally, assessing the fourth Wyeth factor, Eastwood uttered his remarks in a context directly related to the decision-making process.  Indeed, he made these comments during the meeting at which, and at the same time, he advised Greene he would be recommending her termination to the Board.  Moreover, his comment about not hiring her if it were up to him, explicitly relates to the context of the decision-making process and demonstrates that Eastwood's animus motivated his decision.

The foregoing application of the <u>Wyeth</u> factors, especially in light of this Court's recent decisions in similar cases, demonstrates that a reasonable jury could find, contrary to the district court's conclusion, that Eastwood's remarks related to Greene's disability and evidenced his discriminatory animus in making the decision to recommend her termination.

With respect to its second error, the district court concluded:

> [T]he comment is remote with respect to the alleged
> adverse action. While Dr. Eastwood is a decision-maker,
> *it is undisputed that his recommendation to discharge*
> *Greene rested on the many unfavorable evaluations issued*
> *by Tuttle and Creeden.* Accordingly, to the extent that
> Green claims that her discharge was the product of
> disability discrimination, she should also point to evidence
> that Tuttle and Creeden discriminated against her on the
> basis of disability in issuing these unfavorable evaluations.
> See Nagle v. Marron, 663 F.3d 100, 117-18) (2d Cir. 2011)
> (discussing such requirement under the related "cat's paw"
> doctrine in discrimination cases). There is no such
> evidence in the record here. While Greene testified that
> she assumed they were discriminating against her, that
> assumption does not raise a question of fact that either
> Tuttle or Creeden harbored discriminatory animus. As
> such, no "reasonable juror could view [Dr. Eastwood's]
> remark as discriminatory." Henry, 616 F.3d at 149.

(SA-12-13 [emphasis added]). This conclusion if flawed in several respects.

Most critically, contrary to the district court's conclusion, the issue of whether

Eastwood actually relied upon Tuttle's and Creeden's unfavorable evaluations in

making his decision to recommend Greene's termination, in fact, is hotly disputed

by Greene. Indeed, Greene has adduced evidence which, when viewed most

favorably to her, demonstrates that, prior to making his decision to terminate Greene,

Eastwood was not aware of Tuttle's and Creeden's unfavorable reviews and knew

only about the plagiarism incident.[6]

---

[6] In this regard, it is notable that the district court has conflated Greene's "cat's paw" theory.
Greene's claim is not that Tuttle's and Creeden's discriminatory animus tainted Eastwood's
decision, but rather that *Eastwood's* decision, which he made independent of input from Tuttle and
Creeden about Greene's overall job performance, tainted the Board's final determination to accept

To be sure, the District contends otherwise, but a reasonable jury could believe Greene's evidence and reject the Districts.  For instance, the District contends that Eastwood spoke with Greene about her performance when the two met in January 2011, at Greene's request, to discuss her complaint over the desk photograph issue. But Greene denies that Eastwood raised any concerns about her performance and did not discuss the topic at all during this meeting, and neither the district court, nor this Court, may resolve this credibility issue.

Moreover, while Eastwood contends he decided to terminate Greene after hearing her side of the plagiarism charge, the record demonstrates that, in fact, he made this decision days earlier without any meaningful investigation and advised her of the same without asking for her explanation.  Moreover, he did not raise performance issues with her at the April 13, 2011 meeting and cited none of thirteen "reasons" later tendered to Greene as justifying his decision.  Indeed, Eastwood's deposition testimony demonstrates that he was not familiar with any of these grounds, and the District's privilege log demonstrates that Creeden and District counsel were the chief authors of this letter, not Eastwood.  Thus, these alleged reasons did not actually inform Eastwood's decision at the time he made it and,

---

Eastwood's recommendation and terminate Greene's employment.  Thus, the district court's reliance upon Nagle (SA-12) is misplaced.

instead, were erected as post-hoc, pretextual justification, as explained in greater detail in Point II below.

These myriad factual disputes and credibility issues extant in the record are precisely what belie the district court's conclusion and warrant reversal of summary judgment.

The district court's conclusion that "no reasonable juror could view [Eastwood's] remark as discriminatory" because of the lack of evidence of Tuttle's and Creeden's discriminatory animus is also flawed because it misconstrues the law and conflates the McDonnell Douglas analysis. At the *prima facie* stage, Greene bears only the *de minimis* burden of demonstrating an inference of that she was discharged because of her disability, and Eastwood's remarks raise this inference. Thus, even if the court were correct that Eastwood decision rested on Creeden's and Tuttle's unfavorable evaluations, which it is not, the same has no bearing on whether Eastwood's remarks demonstrated his discriminatory animus. Rather, the proper analysis of that question his been set forth above and demonstrates that a reasonable jury could find Eastwood's remarks reflect his bias.

To be sure, at the pretext stage, Greene needs to demonstrate that a reasonable jury could find that the District's asserted non-discriminatory reasons are pretext for discrimination. And, in this regard, the issues of whether or not Eastwood relied on Tuttle and Creeden and whether they discriminated against her on the basis of

disability become relevant. But, even then, she may prevail even if the jury believed that Eastwood relied upon her negative evaluations, so long as it also believed that Eastwood's remarks evidenced his "attitudes and assumptions," see Tomassi, 478 F.3d at 116 toward Greene's disability and that the same substantially motivated his decision. See Kirkland, 2014 WL 3686090 at *4 ("And if at least some of this evidence is believed by a jury, that jury could also conclude that, despite Kirkland's negative performance reviews, his firing was more likely than not based in whole or in part on discrimination, and that the unlawful retaliation would not have occurred but-for the alleged wrongful actions." (quotations & citations omitted)).

Thus, the district court erred by importing this pretext analysis into the *prima facie* stage. And, in any event, as explained, in part, above and in greater detail below, the record contains sufficient evidence from which a jury could find that Eastwood, in fact, did not rely upon Tuttle and Creeden and that, even if he had, their views were objectively unreasonable and unfounded.

Accordingly, a reasonable jury could find that Eastwood's remarks referenced Greene's disability and that they evince his discriminatory intent and recommending her termination and, therefore, the district court erred in holding, as a matter of law, that she failed to establish her *prima facie* case of disability discrimination.

## POINT II

## A REASONABLE JURY COULD FIND THAT THE DISTRICTS' ASSERTED REASONS FOR TERMINATING GREENE ARE A POST HOC, PRETEXTUAL RATIONALIZATION TO COVER FOR EASTWOOD'S TRUE DISCRIMINATORY MOTIVATION.

Having established her *prima facie* case, and the District having asserted a non-discriminatory reason – *i.e.*, its letter of thirteen "reasons" – Greene must now demonstrate that a reasonable jury could find the District's asserted justification is simply pretext for disability discrimination. To do so, she need only demonstrate that her disability was a substantial motivating factor in Eastwood' decision to recommend her termination. See Parker v. Columbia Pictures Industries, 204 F.3d 326, 336-38 (2d Cir. 2000); Holtz, 258 F.3d at 81. A reasonable jury could find from this record that she had carried this burden.

In holding that Greene could not demonstrate pretext, the district court below explained:

> Even if Greene had presented sufficient evidence to raise a question of fact regarding the existence of a prima facie case of discrimination, the defendant has presented a legitimate, non-discriminatory basis for terminating Greene's employment. Dr. Eastwood's letter listed thirteen reasons or incidents justifying the decision. Greene disagrees with the accuracy of many of the reasons given by Dr. Eastwood for his decision, but she has not offered evidence from which a rational jury could conclude that the reasons were pretext for disability discrimination.

(SA-13-14). This conclusion is in error.

First, this conclusion, which presupposes that Greene could establish her *prima facie* case, entirely ignores Eastwood's remarks. Indeed, by assuming for purposes of the pretext analysis that Greene could so establish her *prima facie* case, the district court should have considered those remarks, which are essential to her *prima facie* case, as evidence of pretext instead of claiming that Greene presented "no such evidence." Even without the district court's assumption, as already discussed in Point I above, a reasonable jury could find that Eastwood's remarks to Greene at the April 13, 2011 meeting related to her disability and demonstrated his animus and true motivation.

And, as this Court recently explained, such discriminatory comments, "even if isolated," can create a question of fact as to pretext. See Abrams, 2014 WL 4191178 at *7. Indeed, in Abrams, this Court noted that the plaintiff's claim hinged entirely on the discriminatory remarks at issue because "none of the other evidence offered by [the plaintiff] passes muster." See Id. at *6. Thus, even if these remarks were Greene's only evidence of pretext, the same is sufficient to create a genuine issue of fact as to pretext and preclude summary judgment.

Second, the district court's conclusion ignores Greene's evidence, as set forth in Point I above, demonstrating that, even if the "thirteen reasons" are valid and based upon Tuttle's and Creeden's observations, Eastwood did not actually rely

upon the same when he made his decision that Greene should be terminated. Thus, a reasonable jury could find that these reasons are merely a post-hoc rationalization provided to Eastwood by Tuttle and Creeden after he already based his decision on his true, unlawful, motive. And, when couple with Eastwood's discriminatory remarks, this evidence is sufficient to create a genuine issue of fact regarding pretext, thus, precluding summary judgment.

Finally, the district court's conclusion ignores its earlier recognition when evaluating Greene's *prima facie* case that viewing the evidence in the light most favorably to Greene entails accepting that she "performed her duties well and that her unfavorable reviews from her supervisors were unfounded" (SA-11). There is no reason why that recognition should not continue to apply when evaluating the pretext stage. And, when it does, the necessary conclusion is that viewing the evidence in the light most favorably to Greene demonstrates that most, if not all, of the "thirteen reason" are unfounded. As the Supreme Court aptly explained in Reeves:

> The fact finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reason will permit the trier of fact to infer the ultimate fact of intentional discrimination.
>
> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence

that is probative of intentional discrimination, and it *may be quite persuasive* . . . . In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.

*     *     *     *     *

Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

Reeves, 530 U.S. at 147-48 (emphasis added). Thus, a finding that the County's asserted non-discriminatory reason is false, especially when that reasons is entirely subjective, is strong evidence of intentional discrimination. See Id.

Accordingly, accepting Greene's position as true and accepting all inferences in her favor, demonstrates that the District's asserted justifications, even if actually relied upon by Eastwood, were objectively unreasonable and unfounded. Indeed, Greene wrote contemporaneous rebuttals to each of her negative performance evaluations

This, especially when combined with Greene's prima facie case and coupled with Greene's other evidence of pretext, is sufficient to preclude summary judgment.

Finally, even if a jury were to find credence in the "thirteen" reasons and conclude that Eastwood relied, at least in part, thereupon, it could still plausibly find that Eastwood was substantially motivated by his "attitudes and assumptions," see

Tomassi, 478 F.3d at 116, about Greene's disability and, thus, that the District's asserted justification is merely a pretext to cover his discriminatory action. See Kirkland, 2014 WL 3686090 at *4.

Accordingly, a reasonable jury could find that the District's asserted justification – it's "thirteen reasons" – are merely pretext to cover Eastwood's discriminatory motive and, thus, the district court erred in holding otherwise.

## CONCLUSION

The district court below failed to view the record in the light most favorable to Greene. It resolved a number of questions of fact and made multiple credibility determinations in favor of the District by interpreting Eastwood's remarks to Greene when advising her of his intent to recommend her termination as not referencing her disability when a reasonable jury could plainly interpret his remarks otherwise.

But a proper review of the record demonstrates that a reasonable jury could find from Greene's evidence – including Eastwood's remarks and the falsity of the District's asserted rationale – that Eastwood's recommendation to terminate Greene was substantially motivated by her disability. Accordingly, this Court, respectfully, should reverse and vacate the Opinion and Order and Judgment below and remand the matter for trial.

Dated:          Goshen, New York
                August 29, 2014                    Respectfully submitted,

                                                   SUSSMAN AND WATKINS
                                                   *Attorneys for Plaintiff-Appellant*

                                                   By: _____
                                                       Michael H. Sussman, Esq.
                                                       SUSSMAN AND WATKINS
                                                       P.O. Box 1005
                                                       1 Railroad Avenue, Ste. 3
                                                       Goshen, New York 10924
                                                       (845) 294-3991 [Tel.]
                                                       (845) 294-1623 [Fax]
                                                       sussman1@frontiernet.net

TO:     Matthew J. Mehnert, Esq.
        LAMB & BARNOSKY, LLP
        *Attorneys for Defendant-Appellee*
        534 Broadhollow Road, Suite 210
        P.O. Box 9034
        Mellville, New York 11747-9034
        (631) 694-2300 [Tel.]
        (631) 694-2309 [Fax]
        mjm@lambbarnosky.com

## CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,455 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in Time New Roman 14-point type for text and footnotes.

Dated:      Goshen, New York
            August 29, 2014

                                            _____
                                            MICHAEL H. SUSSMAN

# SPECIAL APPENDIX

# SPECIAL APPENDIX – TABLE OF CONTENTS

Opinion and Order (April 29, 2014)...……………………………………SA-1-14

Final Judgment (May 20, 2014)…………………………………………….SA-15

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                    :
JESYCA GREENE,                      :   12 Civ. 4545 (DLC)
              Plaintiff,            :
                                    :   OPINION AND ORDER
         -v-                        :
                                    :
ENLARGED CITY SCHOOL DISTRICT OF THE :
CITY OF MIDDLETOWN, N.Y.,           :
                                    :
              Defendant.            :
                                    :
------------------------------------ X
```

APPEARANCES:

For the Plaintiff:

Michael H. Sussman
Sussman & Watkins
1 Railroad Avenue, Suite 3
P.O. Box 1005
Goshen, NY 10924


For the Defendant:

Matthew J. Mehnert
Lamb & Barnosky, LLP
534 Broadhollow Road, Suite 210
P.O. Box 9034
Melville, New York 11747


DENISE COTE, District Judge:

     Jesyca Greene ("Greene") has brought this action against

her former employer, the Enlarged City School District of the

City of Middletown, New York ("Middletown"), alleging that her

discharge was the product of discrimination on account of her

disability, in violation of the Americans with Disabilities Act
("ADA"), 42 U.S.C. § 12101 et seq.  On December 13, 2013,
Middletown moved for summary judgment.  For the reasons set
forth below, the motion is granted.

BACKGROUND

     The following facts are undisputed, or taken in the light
most favorable to the plaintiff.  In November 2008, Greene was
hired by Middletown as a Technology Integration Coach for a
"probationary" period of three years.  At or prior to the end of
this probationary period, Greene would be granted or denied
tenure.  The role of a Technology Integration Coach is, inter
alia, to assist classroom teachers in integrating instructional
technology into their curriculum, both through direct coaching
and by working with administrators, department heads, and
library staff.

     Greene is an amputee.  Sometime prior to her employment by
Middletown, she lost her left hand due to complications
resulting from gastric bypass surgery.

     When Greene applied for the technology coach position at
Middletown, she was interviewed by Michael Tuttle ("Tuttle"),
the Chief Technology Officer for Middletown, as well as by Amy
Creeden ("Creeden"), who was a Technology Integration Coach at

2

**SA-2**

the time.   During the interview, Green's amputation was visible to Tuttle and Creeden.   Tuttle recommended to Dr. Kenneth Eastwood ("Dr. Eastwood"), who was Superintendent of Schools for Middletown, that Greene be hired.   Dr. Eastwood in turn recommended her hiring to Middletown's Board of Education ("School Board"), and she was hired effective November 3, 2008.

During her almost three-year period of employment at Middletown, Greene developed a contentious relationship with Tuttle, who was her direct supervisor for approximately two and a half years, and with Creeden, who was initially her co-worker but who became her direct supervisor in the latter part of her third year.   While Greene received a positive evaluation from Tuttle in June 2009, her remaining evaluations from Tuttle in December 2009, March 2010, and June 2010 were unfavorable. Greene believes that these evaluations were unfounded, at least in part, and she wrote rebuttals or objections to each evaluation.   After a meeting with Greene, her Union representative, and Tuttle, it was determined that one of the evaluations would be partially revised by Tuttle to remove a comment about Greene's future employment prospects.

The contentious relationship was not limited to Tuttle's formal evaluations of Greene.   In September 2010, Tuttle docked Greene's pay for missing a half-day of work in June 2010.   In a

3

counseling memorandum, Tuttle describes his understanding of the
events giving rise to the penalty and concludes that she misled
him and took advantage of his professional courtesy.  Greene
wrote a partial rebuttal to Tuttle's understanding of the
circumstances, but agreed that her pay should be docked.

Prior to January 2011, when Creeden was to become Greene's
direct supervisor, Greene considered resigning.  This was due,
at least in part, to her "difficult" relationship with Creeden
and Greene's expectation that it would get worse.  Greene did
not, however, resign when Creeden became her direct supervisor.

In January 2011, Greene alleged that Creeden photographed
her desk at work, that Creeden sent the photograph to Tuttle to
suggest that Greene was conducting personal business at work,
and that Tuttle verbally counseled her as a result.  Greene
suggested in her complaint that she had been subjected to
harassment in violation of Middletown policy.  This incident was
discussed at a January 2011 meeting with Greene, her Union
representative, and Dr. Eastwood.  Dr. Eastwood immediately
requested that Greene make a formal, written complaint.  She did
so on the same day, and her complaint made no mention of
discrimination on the basis of disability.  A formal
investigation was initiated, which concluded that there had been
no violation of Middletown's anti-harassment policy.  Greene was

4

**SA-4**

informed of this conclusion on March 24, 2011.

On the next day, Greene alleged that the harassment had continued and that she had been retaliated against because of her first complaint.  A formal investigation was again initiated, which concluded, in May 2011, that there had been no violation of district policy.

Between January and April 2011, Greene received unfavorable evaluations from Creeden based on classroom observations in January, March, and April 2011, as well as one from Monica Hasbrouk in March 2011.  Hasbrouk was not Greene's supervisor; she had been brought in as a neutral administrator to review Greene's work.  In the April 2011 evaluation, Creeden accused Greene of plagiarism.  The plagiarism allegation was also the subject of a counseling memorandum, in which Creeden notes that Greene was disrespectful when Creeden attempted to speak with Greene about the incident.  Separately, on April 6, when Creeden asked Greene to sign a memorandum to indicate her receipt of the document, Greene refused to do so without a union representative present and screamed at Creeden that she "was not a real administrator."

Greene wrote rebuttals to each unfavorable evaluation, asserting in essence that the material conclusions in the evaluations were unfounded or fabricated.  At no point in any of

5

these rebuttals did Greene allege disability discrimination.

In a meeting on April 13, Dr. Eastwood informed Greene that she was being suspended without pay due to her act of plagiarism.  He further advised her that, as a result of her unsatisfactory job performance and her inability to work cooperatively with her supervisors, he was going to recommend to the School Board at its May 18 meeting that the Board terminate her employment.  In the course of this meeting, Dr. Eastwood referred to Greene as a "poor woe is me type."  Greene alleges that he glanced at her amputated arm as he said it.  Dr. Eastwood states that his comment was a reference to Greene consistently painting herself as the victim of unfair treatment, while refusing to acknowledge the role that her own behavior had played in creating her predicament.

On April 15, Dr. Eastwood sent a four-page letter stating that Greene's lack of professionalism and growth were the reason for his recommendation for termination.  To demonstrate these points, the letter lists thirteen "reasons or events," which consisted of incidents referred to in Greene's evaluations and in her file.  Dr. Eastwood admitted during his deposition that he had no personal knowledge of these events and that his letter setting forth the reasons was based on the written materials in Greene's file.  On May 18, the School Board voted to terminate

6

Greene's employment.

The present action was filed on June 11, 2012.  On December 12, it was reassigned to this Court.  A pretrial schedule was entered on January 25, 2013.  Following discovery, on December 13, Middletown moved for summary judgment.  The motion was fully submitted as of January 24, 2014.


DISCUSSION

Summary judgment may not be granted unless the submissions of the parties taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  The moving party bears the burden of demonstrating the absence of a material fact question, and in making this determination the court must view all facts in the light most favorable to the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on mere "allegations or denial" of the movant's pleadings.  Fed.R.Civ.P. 56(c); Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010).  "[C]onclusory

7

statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted).

In cases involving claims of employment discrimination "an extra measure of caution is merited in affirming summary judgment" because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted). Nonetheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008). Ultimately, the test for summary judgment "is whether the evidence can reasonably support a verdict in plaintiff's favor." James v. N.Y. Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000).

Greene challenges her discharge as the product of discrimination on the basis of disability, in violation of the ADA. The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to [inter alia] . . . discharge of employees." 42 U.S.C. § 12112(a). An ADA employment discrimination claim is subject to the burden-shifting framework established in McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 802 (1972).  See McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013).

Under McDonnell Douglas, once a plaintiff makes out a prima facie case of retaliation or discrimination, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. 411 U.S. at 802-03.  If the defendant produces evidence of such a reason, the plaintiff must point to evidence sufficient to permit a rational factfinder to conclude that the defendant's reason is merely a pretext for discrimination or retaliation. Id. at 803-04; see also Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2003) (summarizing McDonnell Douglas similarly).

In the context of the ADA,

> to establish a prima facie case . . ., a plaintiff
> must show by a preponderance of the evidence that: (1)
> his employer is subject to the ADA; (2) he was
> disabled within the meaning of the ADA; (3) he was
> otherwise qualified to perform the essential functions
> of his job, with or without reasonable accommodation;
> and (4) he suffered adverse employment action because
> of his disability.

McMillan, 711 F.3d at 125 (citation omitted) (emphasis added).

Although "[a] plaintiff's burden at th[e] prima facie stage is de minimis," Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted) (in the context of an ADA retaliation claim), "[s]tray remarks, even if made by a

9

SA-9

decision-maker, do not constitute sufficient evidence [to support] a case of employment discrimination." Danzer v. Norden Systems, Inc., 151 F.3d 50, 56 (2d Cir. 1998). "[O]ther indicia of discrimination" must be "properly presented" for the claim to survive summary judgment. Id. The Second Circuit has described the standards by which district courts are to determine whether remarks are "stray," rather than indicative of discriminatory intent, as follows:

> The more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination. The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative the remark will be.

Henry v. Wyeth Pharma., Inc., 616 F.3d 134, 149 (2d Cir. 2010) (citation omitted). Thus, courts consider four factors to determine whether a remark is probative:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level coworker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

Id.

If the prima facie case is met, the court turns to the second and third part of the McDonnell Douglas framework:

whether defendant has asserted a legitimate, nondiscriminatory
rationale, and whether plaintiff can demonstrate this rationale
to be pretextual.  Summary judgment may be granted if the
plaintiff "has not pointed to any record evidence indicating
that [the defendant's] legitimate reason for the alleged adverse
employment action is a pretext."  Graves v. Finch Pruyn & Co.,
Inc., 457 F.3d 181, 188 (2d Cir. 2006); see also Sista v. CDC
Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006) (granting
summary judgment because plaintiff's argument did not raise a
genuine issue of material fact that "warrant[ed] a jury trial").

Summary judgment is granted to Middletown.  Assuming for
present purposes that Greene has met the first three prongs of
establishing her prima facie case of disability discrimination,
Greene has failed to meet the fourth prong.  Even taking all
inferences in favor of Greene on the undisputed facts -- i.e.,
accepting for present purposes that Greene performed her duties
well and that her unfavorable reviews from her supervisors were
unfounded -- Greene has failed to point to any evidence raising
an inference that her discharge was because of her disability.

Greene's sole argument for why she has established a prima
facie disability discrimination claim is to point to Dr.
Eastwood's "poor woe is me type" statement during the April 13,
2011 meeting.  Under the standards set forth above, this is a

11

"stray remark" that is insufficient to establish a prima facie case of discrimination. The comment itself is "remote and oblique." Henry, 616 F.3d at 149. It does not specifically reference her disability, even when considered in conjunction with the assertion that Dr. Eastwood glanced at Greene's amputated limb when he said it. Rather, it is a statement that refers far more directly to the long history of discord between Greene and her supervisors, and Greene's repeated protests that her discharge is groundless. The comment does not "evince[] a discriminatory state of mind." Id.

As significantly, the comment is remote with respect to the alleged adverse action. While Dr. Eastwood is a decision-maker, it is undisputed that his recommendation to discharge Greene rested on the many unfavorable evaluations issued by Tuttle and Creeden. Accordingly, to the extent that Greene claims that her discharge was the product of disability discrimination, she should also point to evidence that Tuttle and Creeden discriminated against her on the basis of her disability in issuing these unfavorable evaluations. See Nagle v. Marron, 663 F.3d 100, 117–18 (2d Cir. 2011) (discussing such a requirement under the related "cat's paw" doctrine in discrimination cases). There is no such evidence in the record here. While Greene testified that she assumed they were discriminating against her,

12

that assumption does not raise a question of fact that either
Tuttle or Creeden harbored a discriminatory animus.  As such, no
"reasonable juror could view [Dr. Eastwood's] remark as
discriminatory."  Henry, 616 F.3d at 149.

In disputing the conclusion that Dr. Eastwood's remark was
"stray," Green cites three district court cases.  In each of
these cases, however, the remark at issue was direct evidence of
the alleged form of the discrimination.  Savino v. Town of
Southeast, 11 Civ. 483 (NSR), 2013 WL 5730043, at *3 (S.D.N.Y.
Oct. 21, 2013) ("You Guineas think you can get away with
anything" in an Equal Protection national origin case); St.
Louis v. New York City Health & Hosp. Corp., 682 F. Supp. 2d
216, 226 (E.D.N.Y. 2010) ("[Defendant] did not like working with
females" in a Title VII gender case); Silver v. North Shore
Univ. Hosp., 490 F. Supp. 2d 354, 356 (S.D.N.Y. 2007) ("[L]et's
face it, we're both almost 60 years old, right?" in an ADEA
case).  Here, by contrast, the remark was both oblique and
remote from the alleged adverse action.

Even if Greene had presented sufficient evidence to raise a
question of fact regarding the existence of a prima facie case
of discrimination, the defendant has presented a legitimate,
non-discriminatory basis for terminating Greene's employment.
Dr. Eastwood's letter listed thirteen reasons or incidents

13

**SA-13**

justifying the decision.  Greene disagrees with the accuracy of many of the reasons given by Dr. Eastwood for his decision, but she has not offered evidence from which a rational jury could conclude that the reasons were a pretext for disability discrimination.

CONCLUSION

Defendant's December 13, 2013 motion for summary judgment is granted.  The Clerk of Court shall close the case.


SO ORDERED:

Dated:    New York, New York
          April 29, 2014


_____
                    DENISE COTE
          United States District Judge

14

**SA-14**

**UNITED STATES DISTRICT COURT**                                    5/20/2014
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X
Jesyca Greene ,
                              Plaintiff,                    12 **CIVIL** 4545 (DLC)

          -against-                                         **JUDGMENT**

Enlarged City School District of the
City of Middletown, N.Y.,
                              Defendant.
--------------------------------------------------------------X


        Defendant having moved for summary judgment pursuant to Fed. R. Civ. P. 56, and the

matter having come before the Honorable Denise L. Cote, United States District Judge, and the

Court, on April 29, 2014, having rendered its Opinion and Order (Doc. 45) granting Defendant's

motion for summary judgment, it is,

        **ORDERED, ADJUDGED AND DECREED:**  That for the reasons stated in the

Court's Opinion and Order dated April 29, 2014, Defendant's motion for summary judgment is

granted; accordingly, the case is closed.

**Dated:** New York, New York
        May 20, 2014

                                            **RUBY J. KRAJICK**
                                            _____
                                                  **Clerk of Court**
                              **BY:**
                                            _____
                                                  **Deputy Clerk**


**SA-15**